PHILAN INSURANCE LTD., and
Benodet Insurance Ltd.,
Plaintiffs,

v.

FRANK B. HALL & CO., INC., Frank B. Hall Re of New York, Inc., Frank B. Hall Re International, Inc., Frank B. Hall Re De Mexico, S.A., Rollins Burdick Hunter Co., Rollins Burdick Hunter of Bermuda, Ltd., Keough–Kirby Associates, Inc., Keough Kirby Re Ltd., Fielding Juggins Money & Stewart Ltd., trading as Fielding and Partners, PWS Marine Limited, Leonard Smith, Stephen Maloney, and Monroe Birnberg, Defendants.

No. 87 Civ. 4624 (RPP).

United States District Court,
S.D. New York.

Oct. 9, 1990.

Ohrenstein & Brown by Christopher B. Hitchcock, New York City, for plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison by Steven B. Rosenfeld, New York City, for defendants Frank B. Hall & Co., Inc., Frank B. Hall Re of New York, Inc., Frank B. Hall Re Intern., Inc., Frank B. Hall Re de Mexico, S.A.

Palmeri, Gaven & Soberman by Daniel F. Gaven, New York City, for defendants Keough–Kirby Associates, Inc. and Keough Kirby Re Ltd.

Summit Rovins & Feldesman by Ronald E. DePetris, New York City, for defendant Leonard Smith.

Chadbourne & Parke by Charles K. O'Neill, New York City, for defendant Rollins Burdick Hunter (Bermuda) Ltd.

Kroll & Tract by Sol Kroll, New York City, for defendant Fielding and Partners (Fielding Juggins Money & Stewart, Ltd.) and PWS Marine Ltd.

Blum, Gersen, Bushkin, Gaims, Gaines, Jonas & Stream, New York City, for defendant Monroe Birnberg.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

By use of RICO claims, plaintiffs seek to invoke this Court's jurisdiction for the third time. Defendants, in separate motions, move for an order dismissing the Second Amended Complaint on several grounds. This Court (Walker, J.), dismissed plaintiffs' First Amended Complaint in an Opinion and Order dated April 17, 1989, invoking Rules 12(b)(1), 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. *Philan Ins. Ltd. v. Frank B. Hall & Co.*, 712 F.Supp. 339 (S.D.N.Y.1989). Judge Walker granted leave to replead, but admonished plaintiffs that if they chose to replead, the court would strictly scrutinize the Second Amended Complaint for compliance with those rules. *Id.*, 712 F.Supp. at 346.

## I. FACTS

The plaintiffs Philan Insurance Ltd. ("Philan") and Benodet Insurance Ltd. ("Benodet") are two reinsurance companies incorporated in the Cayman Islands. The

circumstance underlying plaintiffs' claims is that defendant Leonard Smith, then a vice-president/account executive and a director of defendant Frank B. Hall Re [1] International, Inc. ("Hall Re International"), and defendant Steven Maloney, chief operating officer and treasurer of both plaintiffs and treasurer of their parent Bridgton Distributing Company, engaged in a scheme from 1983 through 1986 to divert to Smith's and Maloney's personal accounts 10 per cent of payments intended by the ceding insurers to be paid to plaintiffs as reinsurance premiums.

The Second Amended Complaint alleges that the purpose of the scheme was to embezzle 10% of the premium payments for Smith and Maloney, and also to earn commission income for the Hall companies on reinsurance business placed with plaintiffs that plaintiffs would not have accepted absent the conspiracy. In total, Smith and Maloney are alleged to have diverted more than $1 million to themselves.

Smith and Maloney allegedly falsely represented to a principal shareholder of plaintiffs' parent and a director of plaintiff that the insurance brokerage firm of Frank B. Hall & Co., Inc. ("Hall") had agreed to act as plaintiffs' underwriting managers and consultants, and that by utilizing Hall, plaintiffs would be able to attract business. It is alleged that "[i]n truth and in fact, Hall and its various subsidiaries never agreed to act as underwriting managers or consultants for plaintiffs and, in fact, acted as reinsurance intermediaries (i.e., agents) for ceding insurers placing business with reinsurers like plaintiffs." Second Amended Complaint ¶ 29(b).[2]

The fraudulent scheme involved alleged diversions of the premiums, received by the Hall entities allegedly in a fiduciary capacity for plaintiffs, to "conduit" off-shore corporations creating "the appearance of an insurance 'manager,' "[3], see Second Amended Complaint ¶ 32, which would (1) deduct the 10 percent to be stolen by Smith and Maloney and transfer those sums to their accounts, and (2) transfer the remainder of 90% as premiums to plaintiffs, whose principals apparently believed the plaintiffs were receiving payment in full.

As a part of their scheme, Smith and Maloney allegedly first contacted John Lorhan, the president and director of defendant Rollins Burdick Hunter (Bermuda) Ltd. ("RBH Bermuda"), a wholly-owned subsidiary of defendant Rollins Burdick Hunter Company ("RBH"), and outlined the scheme to him. Lorhan allegedly provided a subsidiary of RBH Bermuda, Mansion Management Services, Ltd. ("Mansion"), to serve as the "conduit" corporation, with the understanding that in return Mansion would receive 1% of the premiums received by Smith and Maloney as a fee.

Under this arrangement, it is alleged that Maloney acting on plaintiffs' behalf would accept from brokers certain reinsurance business, and Smith, acting for Hall Re International, would direct the brokers to transmit the premium to Mansion rather than to plaintiffs; Mansion would then forward 90% of the premiums to plaintiffs, 9% to Smith and Maloney and 1% to itself. The complaint sets forth a number of payments received by Mansion in the form of wire transfers from New York into its account at the Bank of Bermuda.

---

**1.** "Re" evidently was used to signify that this subsidiary of defendant Frank B. Hall and Co., Inc. insurance brokers was engaged in placing reinsurance.

**2.** "A 'Reinsurance broker' is defined as 'a solicitor of reinsurance who does not represent reinsurance companies and is employed by the ceding company (reinsured) to place reinsurance on its behalf with markets of his choice, or as designated by the ceding company.'

An intermediary is defined as 'a reinsurance broker who negotiates contracts of reinsurance on behalf of the reinsured, usually with those reinsurers who recognize brokers and pay them commissions on reinsurance premiums ceded . . .' General Reinsurance Co. Glossary of Reinsurance Terms, republished, The National Underwriter, March 13, 1964." *In re Pritchard & Baird, Inc.*, 8 B.R. 265, 267 n. 2 (D.N.J.1980), *aff'd*, 673 F.2d 1301 (3d Cir.1981).

**3.** An insurance manager is authorized to issue an insurance agreement and collect premiums on behalf of its members. *Arkwright–Boston Mfrs Mut. Ins. Co. v. Calvert Fire Ins. Co.*, No. 86–3898, 1987 WL 14466 (S.D.N.Y. July 14, 1987) (LEXIS, Genfed library, Dist. file), *aff'd*, 887 F.2d 437 (2d Cir.1989).

The Second Amended Complaint further alleges that Smith also induced employees of two London reinsurance brokers, defendants Fielding and Partners ("Fielding") and PWS Marine Limited ("PWS"), to take part in the scheme. Callum Stewart, a director of Fielding, and Brian Sounes, the managing director of PWS, are alleged to have diverted to Mansion premiums collected by them on plaintiffs' behalf. Fielding and PWS allegedly thereby received fees for premiums that those companies otherwise would not have earned. Later, plaintiffs allege, Peter Leddy, Fielding's Chief Financial Officer, agreed to send the 10 per cent of the premiums directly into an account at the Bank of Bermuda, the MTM Trust Account, controlled by Maloney. Thereafter, it is alleged that in a meeting between Brian Sounes and Maloney "An agreement similar to the one Smith and Maloney reached with Fielding was also reached with defendant PWS." Second Amended Complaint ¶ 46.

The Second Amended Complaint further alleges that thereafter, in or about November, 1984, Smith resigned from Hall Re International and, with Maloney and Keough–Kirby Associates, Inc. ("Keough–Kirby"), formed Keough Kirby Re Ltd. ("Keough Kirby Re"), a reinsurance intermediary. Smith and Maloney allegedly continued the conspiracy while at Keough Kirby Re, which included the formation in the Cayman Islands, and utilization, of Island Corporate Services, Ltd. ("Island"), another "conduit" corporation posing as an insurance manager. Unlike Mansion, which received the entire premium owed to plaintiffs and then diverted 10% to Smith, Maloney and itself, Island allegedly received 10% only of each premium, the remainder being sent directly to the plaintiffs.

Smith, through his influence with the Hall defendants, is alleged to have produced a substantial amount of reinsurance business for plaintiffs from Union Indemnity Insurance Company of New York ("Union"), a wholly-owned subsidiary of Hall. In return, defendant Monroe Birnberg, president of Union, allegedly demanded and received a portion of the diverted 10% of premiums in excess of $100,000.

Finally, it is also alleged that Maloney and Smith met with Francisco Martinez del Rio, Chief Financial Officer of another Hall subsidiary, Hall Mexico, who agreed to divert 10% of plaintiffs' reinsurance premiums through Island, and to conceal the diversions.

Based on these allegations, plaintiffs assert eight claims: two RICO counts and six state law counts, including common law fraud, conversion, breach of fiduciary duty, and negligence.

## II. DISCUSSION

Plaintiffs' pleading has again resulted in an avalanche of motion papers from the defendants. As will become evident, the Court does not reach every issue raised by the papers.

1. *Subject Matter Jurisdiction over the claims against Hall Mexico, PWS, Fielding and RBH Bermuda*

Hall Mexico, PWS, Fielding and RBH Bermuda argue that this Court does not have subject matter jurisdiction over plaintiffs' claims against them because all of their alleged conduct is acknowledged to have occurred entirely outside the United States. In such circumstances, the Court's obligation is to

> seek to determine whether Congress would have wished the precious resources of the United States Courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries.

*Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). The courts have used two tests to resolve these issues: the "conduct" test and the "effects" test. *See Ohman v. Kahn,* 685 F.Supp. 1302, 1305–06 (S.D.N.Y.1988). If the allegations of the complaint satisfy either of these tests, the Court has subject matter jurisdiction over the claims against Hall Mexico, PWS, Fielding and RBH Bermuda.

### (a) The Conduct Test

■ Under the "conduct" test, there is no subject matter jurisdiction over claims against a defendant unless that defendant knowingly participated in a scheme involving "activities in the United States which were clearly integral to the success of the purported scheme." *Ohman v. Kahn*, 685 F.Supp. at 1305–06. Where foreign plaintiffs such as Philan and Benodet seek to invoke the protections of U.S. courts, they must allege U.S. conduct by a defendant which "directly caused" the complained of loss. *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045–46 (2d Cir.1983); *Bersch v. Drexel Firestone, Inc.*, 519 F.2d at 993. "Mere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction." *Psimenos*, 722 F.2d at 1046.

■ Plaintiffs have not adequately alleged conduct in the United States by the moving defendants which "directly caused" their alleged losses. The heart of the claimed fraud—the diversions—are alleged to have been effected through the use of offshore corporations as "conduits" creating "the appearance of insurance managers" to receive premiums in Bermuda or the Cayman Islands and to disburse them to accounts at the Bank of Bermuda at the expense of two corporations which, by design, are incorporated offshore so as not to be subject to certain United States laws. The act which deprived plaintiffs of money owed to them—*i.e.*, directly caused their loss—was Maloney's non-disclosure to plaintiffs of the full amount of premiums which should have been paid and the diversion to Bermuda and Cayman entities of 10% of that amount for use by himself and Smith. Plaintiffs concede those acts took place outside the United States. Pl. Mem. at 70.

Plaintiffs argue that the scheme was created in New York, citing the laying off of reinsurance risks to plaintiffs by the various Hall entities and Keough Kirby Re and the origination of transmission of premiums through or from New York. Plaintiffs also point to the creation and transmission of false records in and from New York, and the creation of a corporation, Keough Kirby Re, in New York for the purpose of advancing the conspiracy. But these were not the actions that directly caused their loss, but rather were merely preparatory to the act of diverting the premiums, and there is no allegation that the moving defendants knowingly participated in these actions in the United States. As such, these allegations cannot form the basis for the assertion of subject matter jurisdiction over the claims against those defendants. *See Psimenos*, 722 F.2d at 1046 (the fact that representations from New York induced the plaintiff to open and maintain an account which defendant handled fraudulently, "by itself [was] not enough to sustain jurisdiction."); *Bersch*, 519 F.2d at 992. Accordingly, because plaintiffs' losses were not directly caused by sufficient conduct in the United States, plaintiffs' allegations as they relate to defendants Hall Mexico, PWS, Fielding and RBH Bermuda fail to satisfy the "conduct" test.

### (b) The "Effects" Test

■ Plaintiffs also fail the "effects" test.[4] To satisfy that test, plaintiffs must allege specific palpable effects in the United States resulting from the foreign conduct. *Bersch*, 519 F.2d at 987–90 (general adverse economic effects insufficient to establish subject matter jurisdiction). Plaintiffs assert that they have alleged palpable effects in the United States because they have alleged conduct in the United States which violates federal law. The issue, however, is what *effects* that conduct had in the United States which would justify the United States expending its judicial resources in adjudicating the propriety of that conduct as regards the moving defendants. Otherwise, application of the "effects" test would amount to no more than a determi-

---

4. The Court assumes, without deciding, that the "effects" test applies to RICO claims. The "effects" test was first enunciated in *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir.1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), for claims under the Securities Exchange Act of 1934, but has never specifically been applied in the RICO context.

nation of whether the plaintiff has stated a cognizable claim under federal law.

The only case plaintiffs cite in support of their argument, *Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989), is wholly different from this case. There, plaintiffs in making RICO claims alleged that the Marcoses obtained money and jewels by fraud in the Philippines, transported that fraudulently-obtained booty to the United States in order to invest and conceal it, and through their agents in the United States, arranged to, and did, purchase real estate and open bank accounts with those fraudulently-obtained assets. 862 F.2d at 1358. Unlike the actions alleged here, the completion of the fraudulent scheme, not just the preparation, allegedly took place in this country. Since plaintiffs' allegations are not comparable, they fail the "effects" test, and the motions of Hall Mexico, PWS, Fielding and RBH Bermuda to dismiss the complaint as to them are granted.

### 2. *The RICO Issues*

All of the defendants move to dismiss the Second Amended Complaint on the ground (1) that under Rule 12(b) it fails to state a RICO claim, and (2) that under Rule 9(b) the allegations are not made with the particularity required for a RICO claim. Because the Court lacks subject matter jurisdiction over the claims against Hall Mexico, PWS, Fielding and RBH Bermuda, this portion of the motion addresses plaintiffs' claims against the remaining defendants, namely, Hall, Hall Re N.Y., Hall Re International, RBH, Keough–Kirby Associates, Keough Kirby Re, Maloney, Smith and Birnberg. If the Court dismisses the RICO claims, they argue, it lacks subject matter jurisdiction over the state law claims and the entire action must be dismissed.

#### (a) Elements of a RICO claim

■ Plaintiffs are required to allege with particularity the following essential elements of a RICO claim: (1) that the defendant (2) through the commission of two or more predicate acts (3) constituting a pattern (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in or participates in, (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)–(c); *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). In a civil case, to have standing to bring a claim the plaintiff must also show that its injury was "by reason of" the commission of the predicate acts. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

Plaintiffs' RICO claim is predicated on alleged predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343, transportation of stolen monies, 18 U.S.C. § 2314, and receipt of stolen monies, 18 U.S.C. § 2315. In order to withstand a motion to dismiss under Rules 12(b)(6) and 9(b), plaintiffs must also plead each of the elements of these predicate acts with particularity. *Official Publications, Inc. v. Kable News Co.,* 692 F.Supp. 239, 245 (S.D.N.Y.1988), *aff'd in relevant part,* 884 F.2d 664 (2d Cir.1989).

#### (b) Deprivation of "Property"

In dismissing plaintiffs' First Amended Complaint, Judge Walker specified that "plaintiffs provide[d] no specific allegation which might show that the diverted money had become the plaintiffs' property." *Philan,* 712 F.Supp. at 343. An essential element of each of the statutory violations alleged as predicate acts in the Second Amended Complaint is that the plaintiff be deprived of money or property by the fraudulent acts of the defendants. Thus, in order to plead the predicate acts of mail and wire fraud, plaintiffs must plead facts demonstrating a deprivation of a property right or interest. *See McNally v. United States,* 483 U.S. 350, 360, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) (mail fraud statute "limited in scope to the protection of property rights");[5] *Corcoran v. Ameri-*

---

**5.** Plaintiffs argue that the recent amendment to

the mail and wire fraud statutes providing that

*can Plan Corp.*, 886 F.2d 16, 21 (2d Cir. 1989) (plaintiff fails to state a claim under mail fraud statute if he has not alleged "any property right or interest in the monies that defendants allegedly stole from" plaintiff).

The property requirement also applies to the predicate act of transportation, and the predicate act of receipt, of stolen property. *See United States v. Bennett*, 665 F.2d 16, 22 (2d Cir.1981) (§§ 2314 and 2315 "inapplicable where the theft or fraudulent taking has not deprived the owner of the goods, or a person having an interest tantamount to ownership, of the perquisites of ownership"); *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163, 164 (2d Cir. 1978) ("stealing is still essentially an offense against another person's proprietary or possessory interests in property" and does not include "all illegal takings").[6]

A failure to set forth facts showing that plaintiffs had a property right in the premiums is a failure to allege RICO causation; if the monies did not belong to the plaintiffs at the time of diversion, they were not injured by reason of the unlawful taking. Thus, a failure in the pleading to demonstrate adequately that the plaintiffs had property rights in the monies in question is fatal to the entire RICO claim.

Defendants argue that the monies allegedly diverted by defendants are not demonstrated by allegations in the complaint to be property of, or to belong to, the plaintiff reinsurance companies, and therefore the plaintiffs were not deprived of a property right by the alleged diversions. Specifically, since, under the plaintiffs' own allegations, the monies in question were in the possession of the reinsurance intermediar-

ies at the time that the defendants caused funds to be transferred to Mansion and Island, and the reinsurance intermediaries were admittedly agents of the ceding insurance companies, defendants argue the monies received by the defendant reinsurance intermediaries did not belong to the plaintiffs at the time of the diversion to the conduit corporations.

Plaintiffs rely on their repeated allegation of a fiduciary relationship between the plaintiffs and the defendant reinsurance intermediaries typified in ¶ 30 of the Second Amended Complaint, which states that the reinsurance intermediaries,

> ... while acting as the agents of ceding insurers, were responsible as fiduciaries for collecting on behalf of assuming reinsurers such as plaintiffs the reinsurance premiums paid by ceding insurers and exercising due care in remitting these premiums to such assuming reinsurers.

Similarly in ¶ 55 of the Second Amended Complaint plaintiffs allege that:

> By agreeing to pay and direct the payment of funds to Island ... Keough Kirby Re willfully violated its fiduciary duty to Philan and Benodet as agent in recovering their premiums, to handle those premiums for their benefit and in their best interests.

Thus, plaintiffs, although acknowledging in Paragraphs 24, 25, 29(b) and 30 of the complaint that the reinsurance intermediaries were agents of the ceding insurers, contend that allegations like those contained in ¶¶ 30 and 50 of the Second Amended Complaint adequately plead that plaintiffs had a property interest in the premiums when the diversions occurred.[7]

---

a scheme to defraud includes a scheme to deprive another of the intangible right of honest services, 18 U.S.C. § 1346, permits this Court to apply the law as it was interpreted before *McNally* to the alleged conduct of the defendants in this case, which occurred before the enactment of the amendment. The Court rejects this argument. *See McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786 (1st Cir.1990); *United States v. Bush*, 888 F.2d 1145 (7th Cir.1989).

**6.** *See also United States v. Porcelli*, 865 F.2d 1352, 1369 (2d Cir.1989), *cert. denied*, —— U.S.

——, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989), where the court stated:

a debtor does not deprive his creditor of the creditor's property simply by failing to pay the debt.... Though the mail fraud statute has been given broad application, it has never been interpreted to cover non-payment of debt and may not be so interpreted after *McNally.*

**7.** Plaintiffs also argue, citing *GLM Corp. v. Klein*, 684 F.Supp. 1242, 1245 (S.D.N.Y.1988), that even if the defendants were not fiduciaries of plaintiffs, the complaint adequately alleges

■ Generally, conclusory allegations that the defendants were acting as fiduciaries for plaintiffs insofar as they held premiums ultimately owed to plaintiffs are not sufficient. *See Ambrosino v. Rodman & Renshaw, Inc.*, 635 F.Supp. 968, 973 (N.D. Ill.1986) (bare assertion of fiduciary duty do not suffice to state claim for negligent misrepresentation or constructive fraud). Without such compliance with Rule 9 the plaintiffs have not alleged facts as to the insurance intermediaries and their parents showing that plaintiffs suffered injury by reason of the commission of the alleged predicate acts.

To support their position that their allegations are sufficient, plaintiffs' memorandum of law in opposition to the motion relies on three arguments: (1) that under New York law reinsurance intermediaries act in a fiduciary capacity to the reinsurers, (2) that there is an industry-wide understanding that a reinsurance intermediary holds premiums as agent for the reinsurer, not the reinsured, and (3) that the intermediary's agency status is, in any event, a fact issue. Pl. Br. in Opp. at 37–38. Specifically, plaintiffs argue first that New York Insurance Law § 2120(b) (McKinney 1985), which provides that reinsurance intermediaries acting as such in New York shall be responsible "in a fiduciary capacity for all funds received or collected in such capacity," and forbids the commingling of funds, supports its position. The statute, however, does not answer the question of to whom is the fiduciary duty owed, the ceding insurer or the reinsurer. *See also* N.Y.Comp.Codes R. & Regs. tit. 11, § 32.3 (1982).

A review of the case law also makes it clear that contrary to plaintiffs' claim, there is no general rule that insurance intermediaries act in a fiduciary capacity to reinsurers in collecting and holding premiums but does support the position that the specific factual situation demonstrating the parties' intent determines whether the intermediary acts as agent of the ceding insurer or of the reinsurer.

In *In re Pritchard & Baird, Inc.*, 8 B.R. 265 (D.N.J.1980), *aff'd*, 673 F.2d 1301 (3d Cir.1981), the appellate court upheld the ruling of the bankruptcy court that Pritchard & Baird was the agent of the ceding insurer (reinsured), not the reinsurer, while holding premiums intended for the reinsurer. *Id.* at 269–70. *See also Aetna Ins. Co. v. Glens Falls Ins. Co.*, 453 F.2d 687 (5th Cir.1972) (reversing a district court and holding that intermediary was agent of the reinsured); *Calvert Fire Ins. Co. v. Unigard Mut. Ins. Co.*, 526 F.Supp. 623, 638–39 (D.Neb.1980), *aff'd*, 676 F.2d 707 (8th Cir.1982) (after bench trial, court found that facts established that intermediaries, including Pritchard & Baird, were agents of the reinsured while holding premiums intended for the reinsurer).

In contrast, in *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 695 F.Supp. 156 (S.D.N.Y.1988), *aff'd*, 887 F.2d 437 (2d Cir.1989), the jury, having heard testimony "probative of an industry-wide understanding that the broker is the reinsurer's agent for payment," *id.* at 161, found that the intermediary Pritchard & Baird was the agent of the reinsurer's insurance manager and of the reinsurers for purposes of collection of premiums.[8]

In the light of this case law, plaintiffs' failure to heed Judge Walker's admonition regarding the necessity of alleging facts to support plaintiffs' claim that the intermediary defendants had a fiduciary relationship

---

the predicate acts of mail and wire fraud because defendants are alleged to have caused an employee of plaintiffs, Maloney, to breach his fiduciary duty to plaintiffs, thereby participating in a scheme to defraud. This argument misses the point. As the court in *GLM* made clear, only one who has been "wrongfully deprive[d] ... of money or property" may bring a claim predicated on mail or wire fraud. *Id.* Even if plaintiffs were correct on this ground, plaintiffs must still show causation to establish their RICO claim, which cannot be done if the

money did not belong to them when it was in the possession of the reinsurance intermediaries and transmitted by wire or mail.

**8.** That court's utilization of a special jury interrogatory demonstrates that the parties' intent is what governs. It is noted that the interrogatory answered by the jury however was capable of an interpretation requiring the answer the jury gave.

to, or were acting in an agency relationship for, the plaintiffs so as to support plaintiffs' claim of property rights is explicable only on the ground that plaintiffs possess no facts to support their conclusory allegations and are relying on an "industry-wide understanding," and that inept pleading is not involved.

This pleading deficiency is particularly significant in the unusual background of this case which Judge Walker described as

> Before they filed this suit, plaintiffs conducted a year-long investigation of this alleged criminal scheme through the offices of a professional insurance investigator and, in that investigation, plaintiffs had at the very least significant cooperation from almost every named defendant in this case.

*Philan,* 712 F.Supp. at 343.

Judge Walker concluded, "Yet the plaintiffs provide no specific allegations which might show that the diverted money had become the plaintiffs' property." *Id.* Under these circumstances, the purposes of Rule 9(b) as set forth in *Divittorio v. Equidyme Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987), take on added importance. *See also, Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972).

The facts alleged in the complaint however do provide an explanation of why plaintiffs are unable to plead facts supporting a fiduciary relationship as to the corporate defendants in their role of holding premiums owed to plaintiffs. Maloney, the key participant in the fraud alleged, was chief operating officer and treasurer of both plaintiffs. Because of his role, it was primarily his intent which controlled any fiduciary relationship that may have existed between plaintiffs and the reinsurance intermediaries. Maloney could not have intended the reinsurance intermediaries would act as fiduciaries for plaintiffs because, quite to the contrary, he had arranged that they direct the premiums (or treaty balances, as certain payments to reinsurers are referred to) to Mansion, the MTM account or Island rather than to Philan and Benodet so that funds could be diverted according to his scheme. Malo-

ney's intent was to create a relationship in furtherance of a fraudulent scheme rather than one embodying fiduciary obligations.

This raises the further issue of the ability of plaintiffs to plead scienter as regards the remaining corporate defendants. The insurance intermediaries other than Fielding and PWS are not alleged to have had knowledge that there was no insurance manager. There are no facts pleaded that demonstrate that the corporate insurance intermediaries and their parents had knowledge of the fraud alleged. Instead, it is alleged that the beneficiaries of the fraud, Smith and Birnberg, had such knowledge.

■ Under these circumstances, the allegations against the remaining corporate defendants are not sufficient to withstand a motion to dismiss the RICO cause of action. The plaintiff remaining unable to plead one fact or cite any document demonstrating that any of the remaining intermediary defendants were acting in a fiduciary relationship in holding or collecting premiums for plaintiffs and being unable to show scienter, the cause of action against the intermediary corporate defendants and their corporate affiliates fails. Corporate defendants cannot be held vicariously liable under RICO for the individual wrongdoing of their employees on a theory of respondeat superior where plaintiff has not alleged any facts which portray the company as an active perpetrator of the fraud or a central figure in the criminal scheme. *See Banque Worms v. Luis A. Duque Pena E. Hijos, Ltda.,* 652 F.Supp. 770, 773 (S.D.N.Y.1986) ("[I]t would be a distortion of both the language and intent of the statute to hold the corporation vicariously responsible under RICO for an elaborate fraud merely because one of its employees may have contributed to the scheme."); *Intre Sport Ltd. v. Kidder, Peabody & Co.,* 625 F.Supp. 1303, 1309–10 (S.D.N.Y.1985), *aff'd as modified,* 795 F.2d 1004 (2d Cir.1986), *cert. granted, vacated and remanded on unrelated grounds,* 482 U.S. 922, 107 S.Ct. 3203, 96 L.Ed.2d 690 (1987).

■ On the other hand, plaintiff has adequately alleged a deprivation of a property interest and RICO causation, as well as

scienter, as to the individual defendants. In this regard, it is necessary to distinguish between the role of the reinsurance intermediaries in collecting or holding premiums and the role of individual officers employed by the reinsurance intermediaries in the administration or management of the premiums.

Plaintiff alleges that Maloney had responsibility for obtaining third-party reinsurance business. Second Amended Complaint ¶ 21. Pursuant to this duty, Maloney had the power to structure the method and manner of premium payments and to designate co-agents for such purpose. The complaint alleges that in many cases, Smith "directed" the reinsurance intermediaries to send premium monies to Island or Mansion rather than directly to plaintiffs. *See* Second Amended Complaint ¶¶ 98(a), (c), (g), 105(i), (1), and (z)(aa). Birnberg allegedly directed the method of premium payments in a similar fashion. *Id.* ¶ 62.

Insofar as the individual defendants are alleged to have had authority to direct the payment of premiums to certain entities, plaintiffs have adequately pled an agency relationship. Thus, plaintiffs allege a deprivation of a property interest in premiums which Smith and Birnberg directed be paid to Island or Mansion in furtherance of the alleged fraud. There are facts pleaded also which constitute either direct or inferential evidence of the knowledge of the individual defendants, Maloney, Smith and Birnberg, that the plaintiffs' property had been stolen or was being misapplied.

### III. CONCLUSION

For the foregoing reasons, (1) the Second Amended Complaint is dismissed with prejudice as to defendants Hall Mexico, PWS, Fielding and Rollins Burdick Hunter (Bermuda) pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, and (2) the causes of action claiming RICO violations are dismissed pursuant to Rules 9(b) and 12(b) as to the remaining corporate defendants. The Court declines to exercise pendent party jurisdiction over the state law claims asserted in counts three through eight against the corporate defendants as

to whom all federal claims have been dismissed. *See Aldinger v. Howard,* 427 U.S. 1. 14–16, 96 S.Ct. 2413, 2420–2421, 49 L.Ed.2d 276 (1976). The motion to dismiss counts one and two is denied as to individual defendants Smith, Maloney and Birnberg and the Court exercises pendent jurisdiction to retain counts three, four, five and eight as against these individual defendants.

IT IS SO ORDERED.